**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> CAMBRIDGE INVESTMENT RESEARCH ADVISORS, INC., <br><br> Defendant, and <br><br> CAMBRIDGE INVESTMENT RESEARCH, INC., <br><br> Relief Defendant. | Case No.: 22-cv-71 |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "SEC"), alleges as follows:

## SUMMARY

1.      Defendant Cambridge Investment Research Advisors, Inc. ("CIRA") is an SEC-registered investment adviser.  Relief Defendant Cambridge Investment Research, Inc. ("CIRI") is an SEC-registered broker-dealer.  CIRA and CIRI are affiliates: they each are wholly-owned subsidiaries of Cambridge Investment Group, Inc. ("CIGI") and have the same board of directors and key executives.

2.      As an investment adviser, CIRA owes its advisory clients a fiduciary duty to, among other things, act in its clients' best interests, seek best execution of a client's transactions, and fully and fairly disclose all material facts about the advisory relationship, including

disclosing any conflicts of interest that might cause CIRA to put its own interests before those of its clients.  CIRA's clients paid it an advisory fee in exchange for CIRA selecting and managing their investments in a manner consistent with its fiduciary duty.

3.      As alleged in this Complaint, CIRA breached its fiduciary duty and regularly and repeatedly put its financial interests ahead of its clients.  CIRA also continuously failed to disclose to its clients material facts about its conflicts of interest, including that some investment choices generated additional revenue for its affiliate CIRI, and/or permitted CIRA to avoid paying fees, while other investment choices would have generated much less or no revenue, and/or the paying of fees.  In many cases these other investment choices were less expensive, and therefore more beneficial, for CIRA's clients.

4.      The undisclosed conflicts of interest at issue in this case created incentives for CIRA to select and hold investments for advisory clients that financially benefited CIRA and CIRI over the interests of CIRA's clients, including the incentive to select and hold investments that were more expensive for clients.

5.      CIRA and CIRI, acting as CIRA's affiliated broker-dealer, collectively benefited by millions of dollars as a result of CIRA breaching its fiduciary duty and defrauding its clients.

6.      Over the course of several years, CIRA defrauded its advisory clients and/or repeatedly breached its fiduciary duty that it owed to them in five primary ways:

7.      *First*, from at least January 2014 and, in many cases, continuing to the present, CIRA invested clients in certain mutual funds, including "no transaction fee" ("NTF") mutual funds and money market cash sweep funds ("sweep funds"), that generated, or had the potential to generate, revenue for CIRI from clearing brokers.  CIRI's revenue sharing agreements with the clearing brokers created financial incentives for CIRA to select investments that would lead

to greater compensation to CIRI, but that were not in the best interests of CIRA's clients.  CIRA did not adequately disclose all material facts regarding the conflicts of interest that arose when it invested its advisory clients' assets in more expensive NTF mutual funds and sweep funds that would generate revenue for CIRI, while other less expensive options were available to clients that would not provide that additional compensation.

8.     During this same time period, CIRA also failed to act consistent with its duty of care obligations to its clients, which requires that CIRA provide advice in the best interest of clients, by failing to seek best execution and evaluate whether clients should be placed in and/or moved to a lower-cost fund.  Moreover, CIRA's investment of clients in more expensive funds when lower-cost options were available, and failure to assess whether clients should be converted to lower-cost options, is contrary to CIRA's disclosures to clients that it would "endeavor at all times to put the interest of [its] clients ahead of [its] own."

9.     ***Second***, from at least January 2014 to at least December 2016, CIRA had a financial incentive to select NTF mutual funds for its "wrap account" advisory clients (*i.e.*, clients who paid CIRA an all-in "wrapped" advisory fee that covered not only investment advice, but also any transaction fees) for which CIRA did not have to pay transaction fees, rather than lower-cost options for which CIRA would have to pay transaction fees.  To the present, CIRA has invested and held wrap account clients in more expensive NTF mutual funds even when lower-cost options were available, even after CIRI moved to an asset-based fee model for brokerage services in December 2016 that eliminated transaction fees.

10.    From at least January 2014 to at least December 2016, CIRA violated its fiduciary duty to clients by failing to disclose its conflicts of interest associated with recommending that wrap account clients purchase NTF mutual funds for which CIRA would avoid paying

transaction fees.  From at least January 2014 to the present, CIRA also violated its fiduciary duty to clients by (1) investing wrap account clients in NTF funds that were not in the clients' best interest; (2) failing to seek best execution; and (3) failing to evaluate whether clients should be moved to a lower-cost mutual fund option.

11.     ***Third***, beginning in July 2017 and continuing through the present, CIRA repeatedly violated its fiduciary duty to clients by converting certain traditional accounts to wrap accounts without providing clients with full and fair disclosure concerning the conversions, and instead providing false and misleading information regarding the necessity for the conversions. CIRA also failed to disclose that it had a financial incentive to convert clients from traditional accounts to wrap accounts given that CIRA collected higher advisory fees from wrap accounts. Further, CIRA violated its fiduciary duty by failing to adequately determine whether the conversion was in each client's best interest consistent with its duty of care.

12.     ***Fourth***, from at least January 2015 to March 2018, CIRA failed to adequately disclose to its clients CIRI's program of giving forgivable loans to CIRA investment adviser representatives and the associated conflicts of interest.

13.     ***Fifth***, from at least January 2014 to the present, CIRA failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Investment Advisers Act of 1940 ("Advisers Act") in connection with its investment selection, selection of account type for clients, making recommendations of investments that were in the best interests of its advisory clients, and disclosure of conflicts of interest.

14.     By engaging in the conduct alleged herein, CIRA violated Sections 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(2) and 80b-6(4)], and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].  The SEC requests, among other things, that this Court enjoin CIRA

from committing further violations of the federal securities laws as alleged in this Complaint, and order CIRA to pay monetary penalties based upon these violations.  The SEC also requests that CIRA and relief defendant CIRI disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over this action pursuant to Sections 209(d), 209(e)(1), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1), and 80b-14].

16.     Venue is proper in this district under Section 214 of the Advisers Act [15 U.S.C. § 80b-14] and 28 U.S.C. § 1391(b)(1) and (2) because, among other things, CIRA inhabits, resides, and transacts business in this district, and certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

17.     CIRA has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

## THE DEFENDANT

18.     Defendant **CIRA**, headquartered in Fairfield, Iowa, has been registered with the SEC as an investment adviser since at least February 2005.  CIRA is a wholly-owned subsidiary of CIGI.  CIRA is in the business of providing investment advice concerning securities for compensation.  As of June 2021, CIRA has more than 3,000 employees, more than 3,300 investment adviser representatives ("IARs"), more than 211,000 advisory clients (who

collectively hold more than 337,000 accounts), and more than $68.5 billion in regulatory assets

under management, the majority of which are associated with discretionary client accounts.

19.     CIRA entered into agreements to toll or suspend the running of any statute of

limitations for the period from January 7, 2019 through March 1, 2022.

## THE RELIEF DEFENDANT

20.     Relief Defendant **CIRI**, also headquartered in Fairfield, Iowa, has been registered

with the SEC as a broker-dealer since 1995.  Prior to February 2005, CIRI was dually registered

as a broker-dealer and investment adviser, and CIRA's advisory services were conducted under

CIRI in its former capacity as an investment adviser. CIRI is also a wholly-owned subsidiary of

CIGI.  CIRI and CIRA have the same board of directors, and key executives hold the same

positions, roles, and responsibilities at both firms, including compliance relating to the

misconduct alleged in this Complaint.  Some CIRA IARs are also licensed as registered

representatives of CIRI.  Because CIRI employees regularly perform services for CIRA and vice-

versa, CIRI, CIRA, and another related third party entity have entered into an expense-sharing

agreement to apportion certain costs and expenses, including administrative and overhead

expenses, between CIRI and CIRA.

21.     CIRI entered into agreements to toll or suspend the running of any statute of

limitations for the period from September 10, 2020 through March 1, 2022.

22.     CIRI, as a relief defendant, has no legitimate claim to the revenue sharing it

received as alleged in the Complaint because it obtained the payments as a result of CIRA's

fraudulent conduct.

## FACTUAL ALLEGATIONS

**I.      CIRA's Advisory Services**

23.      CIRA provides investment advisory services to a variety of clients, including individual retail clients who rely on investments in their CIRA advisory accounts for, among other things, income and retirement.  CIRA's advisory services include both investment advice and the ongoing management of clients' investment portfolios.  CIRA provides advisory services through over 3,300 IARs.

24.      CIRA is an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because it is engaged in the business of providing investment advice as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.

25.      In exchange for these advisory services, CIRA generally charges its clients advisory fees equal to a percentage of the dollar amount of the client's assets under management.  These advisory fees are periodically deducted from the clients' advisory accounts.

26.      CIRA advises clients through both traditional management programs and wrap programs.  Under the traditional management programs, there are two separate types of fees directly charged to clients: an investment advisory fee for advisory services charged by CIRA, and a ticket charge, or transaction fee, for each transaction (*i.e.*, buy/sell/exchange) in the client's account charged by CIRI.

27.      Under a wrap program, advisory services and transaction services are provided for a single fee that CIRA directly charges the client.  Wrap program clients pay CIRA an advisory fee based on the amount of the clients' assets CIRA advises, but do not pay separate transaction fees for trades.  Rather, clients pay an annual fee that covers the costs of several services

"wrapped" together, including transaction fees.  CIRA is responsible for paying any transaction

fees charged for trades made in wrap accounts.

28.     CIRA advises a majority of its clients (both in terms of regulatory assets under

management and number of accounts) through its wrap programs.

29.     CIRA typically manages the client accounts in its traditional and wrap programs

on a discretionary basis, meaning that advisory clients have granted CIRA the authority to trade

the assets in their advisory accounts without CIRA needing to obtain specific approval from its

clients for each transaction.

30.     CIRA typically invests clients' wrap accounts in mutual funds, stocks, and bonds,

with a heavy emphasis in mutual funds.  As described more below, mutual funds generally have

their own fees that come out of the funds' assets.

31.     As a registered investment adviser with the SEC, CIRA is required to file and

update, at least annually, disclosures in a uniform registration application called a Form ADV.

As part of this application, CIRA is required to create an SEC-mandated Form ADV Part 2A or

brochure ("Brochure"), containing certain disclosures about its advisory business.  At least once

a year, from at least 2013 through 2021, CIRA filed a Brochure with the SEC, posted a copy of

the latest Brochure to its publicly-available website, and provided to every advisory client a

summary of material changes to the Brochure.

32.     As an investment adviser, CIRA is a fiduciary for its advisory clients.  As such,

CIRA owes its advisory clients an affirmative duty of utmost good faith, is obligated to provide

full and fair disclosure of all material facts, has an affirmative obligation to employ reasonable

care to avoid misleading its clients, has a duty to act in its clients' best interests, and has a duty to

seek best execution of a client's transactions.  CIRA's duty to disclose all material facts includes

a duty to tell clients about all of its actual or potential conflicts of interest that might influence

CIRA or its IARs to render investment advice that is not disinterested.

33.     CIRA acknowledges this fiduciary duty in, among other places, its Brochure,

which CIRA is required to provide to clients.

## II.     Background on Mutual Funds and Money Market Sweep Funds

34.     Mutual funds are investment products often used by individuals.  A mutual fund

pools money from many investors and invests the money in securities or other assets.  A mutual

fund has various expenses that are paid from fund assets.  These internal expenses are reflected

in the fund's "expense ratio."  Such expenses include fees paid to the adviser that manages the

fund, operational expenses, and fees paid to the brokers that sell shares of, and provide services

to, the mutual fund.  These are ongoing fees and expenses charged throughout the life of the

mutual fund investment.  Fees and expenses are an important consideration in selecting a mutual

fund because these charges lower an investor's returns.

35.     There are many types of mutual funds that cover a variety of investment

objectives and with different portfolios of securities.  Each mutual fund often has multiple,

different "share classes."  Each share class of a mutual fund represents an interest in the exact

same portfolio of securities, with the only principal difference typically being the cost to the

investor.  An individual investor may pay more, or less, for precisely the same mutual fund

investment, depending on the share class.  Share classes that have higher costs, or expense ratios,

generally have lower returns than share classes with lower expense ratios.

36.     Additionally, when investors purchase or sell mutual funds through clearing

brokers – *i.e.*, broker-dealers that maintain custody of investor assets and execute all securities

trades – the clearing brokers may or may not charge a transaction fee.  Clearing brokers

generally offer a "no transaction fee" ("NTF") program, through which investors can purchase and sell from a menu of mutual funds without a transaction fee.  The clearing brokers also offer a "transaction fee" ("TF") program, through which investors can purchase and sell from a different menu of mutual funds, with a transaction fee.

37.      In general, NTF mutual funds have higher internal expense ratios than TF mutual funds.  In many instances, the NTF mutual funds also have TF share classes available with lower expense ratios but that charge a transaction fee.  It is often in the client's best interest to be in the mutual fund share class with the lowest expense ratio, even when the client pays a transaction fee.

38.      When a client is in a wrap account (*i.e.*, an account for which CIRA, rather than the client, is responsible for paying transaction fees), it is in the client's best interest to be in the mutual fund share class with the lower expense ratio.  A CIRA client who held NTF mutual funds in a wrap account would pay higher total annual fund expenses over time – and would therefore earn lower returns – than one who held a lower-cost share class of the same fund.

39.      CIRA also recommended to eligible clients different cash sweep account programs offered by CIRI.  A cash sweep account is an interest-bearing bank account or money market mutual fund used by broker-dealers to hold cash (*e.g.*, incoming cash deposit, dividends, or certain investment returns) until the investor or adviser decides how to invest the money.  The cash is automatically deposited, or "swept," into the cash sweep account.

40.      A money market mutual fund is a type of mutual fund that generally invests in short-term, highly liquid securities with limited credit risk.  As with other mutual funds, money market mutual funds may offer investors different share classes.  Each share class represents an interest in the same portfolio of securities with the same investment objective, with the primary

difference among the share classes being the fee structure.  CIRA invested clients in money market funds ("sweep funds") as part of the cash sweep account program.

**III.**     **The Role of CIRI and the Clearing Brokers**

41.     CIRA typically required its clients to use CIRI as an introducing broker, meaning CIRI acted as an intermediary by taking orders from CIRA regarding the purchase or sale of securities, and then contracted with a clearing broker who actually received payments and securities and executed trades.

42.     Since at least January 2014, CIRI has contracted with two firms – Clearing Broker 1 and Clearing Broker 2 – to provide custody and clearing services for the vast majority of CIRI's customers, including CIRA advisory clients.  These firms maintain custody of investor assets and execute all securities trades for CIRA accounts, including wrap accounts.  CIRA discloses in its Brochure that "[b]ecause CIRA and [CIRI] are under common ownership and have mutual executive officers and control persons, the decision to use [Clearing Broker 1] and [Clearing Broker 2] is mutually determined by both [CIRI] and CIRA."  Clearing Broker 1 and Clearing Broker 2 offer to CIRA clients both an NTF and TF mutual fund program.

43.     Additionally, from at least January 2014 to at least May 2019, CIRA and CIRI had agreements in place with another clearing firm – Clearing Broker 3 (collectively, with Clearing Broker 1 and Clearing Broker 2, the "Clearing Brokers") – to, among other things, serve as an introducing and clearing broker for certain CIRA accounts.  Clearing Broker 3 also offered to CIRA clients similar NTF and TF mutual fund programs.

IV.     **CIRA Breached Its Fiduciary Duty to Clients in Connection with CIRI's Receipt of <u>Revenue Sharing</u>**

44.     From at least January 2014 through the present, CIRI had agreements to receive compensation from one or more of the Clearing Brokers as a direct result of CIRA investing its advisory clients in certain NTF mutual funds and/or sweep funds that were offered by the Clearing Brokers.  As a result of these arrangements, CIRA's interests were in conflict with its clients' interests.  The arrangements created financial incentives for CIRA to select NTF mutual funds and sweep funds that would lead to greater compensation to its affiliated broker-dealer CIRI, and often that were not in the best interests of CIRA's clients.

45.     CIRA either did not disclose, or did not adequately disclose, these material conflicts to its advisory clients.  CIRA's failures to disclose this information were omissions of material fact, CIRA was required by law to fully disclose its conflicts of interest to its advisory clients, and CIRA was at least negligent in failing to disclose such information.  Certain other disclosures were materially false and misleading, and CIRA also acted at least negligently regarding those disclosures.

46.     In addition, from at least January 2014 to the present, CIRA invested and/or held client assets in NTF mutual funds and sweep funds, including those that generated revenue sharing for CIRI, but which were more expensive than other shares classes of the same fund, or in the case of sweep funds more expensive than other similar funds.  By doing so CIRA at least negligently breached its fiduciary duty to its clients by failing to act in the clients' best interests and/or failing to seek best execution.

A.      **CIRI's Revenue Sharing with the Clearing Brokers**

47.     When CIRA purchased or sold NTF mutual funds for clients, clients did not pay a transaction fee, but they did pay fees for their share of mutual fund expenses (*e.g.*, expense ratios).  The Clearing Brokers received a certain percentage of revenue from the NTF mutual funds by way of recurring payments paid by the mutual funds in exchange for being offered by the Clearing Broker as an NTF mutual fund.  The Clearing Brokers then shared a portion of the fees it received with CIRI.

48.     Since at least January 2014, under agreements between CIRI and the Clearing Brokers, the Clearing Brokers shared these recurring fees, or mutual fund revenue, with CIRI based on CIRA's client assets invested in NTF mutual funds ("NTF revenue sharing" or "NTF revenue").  However, the Clearing Brokers would not pay this revenue sharing to CIRI if CIRA's client assets were invested in TF mutual funds or certain fund families.

49.     CIRI stopped receiving NTF revenue from Clearing Broker 3 in May 2019 when CIRA ended its relationship with Clearing Broker 3.  In August 2019, CIRI amended its agreement with Clearing Broker 1 to provide that CIRI would stop receiving NTF revenue, and CIRI may have stopped receiving NTF revenue from Clearing Broker 2 at some point in 2019.

50.     Also since at least January 2014 through at least May 2020, CIRI received revenue from Clearing Broker 2 based on CIRA client assets invested in certain sweep funds that Clearing Broker 2 offered as sweep account investment options ("sweep revenue sharing" or "sweep revenue").  CIRI also received sweep revenue sharing from Clearing Broker 1 from at least September 2016 through at least April 2020.  CIRI maintains these sweep revenue sharing agreements to the present.  The revenue sharing payments are generated from a portion of the assets on the uninvested cash in the clients' accounts.

51.     From at least January 2014 through the present, CIRA has placed and/or held clients' assets in NTF mutual funds, including funds that resulted in NTF revenue to CIRI, even when other lower-cost share classes of the same mutual funds were available to clients.  During this time, CIRI has received millions of dollars in NTF revenue from the Clearing Brokers based on CIRA clients' investments.

52.     Further, from at least January 2014 through the present, CIRA has placed and/or held clients' assets in sweep funds, including funds that resulted in sweep revenue sharing payments to CIRI, even when other lower-cost sweep funds, or share classes of the same funds, were available to clients.  Indeed, CIRA selected sweep funds that resulted in sweep revenue as the "default" sweep fund option for client accounts.  During this period, CIRI has received millions of dollars in sweep revenue from Clearing Broker 1 and Clearing Broker 2 based on CIRA clients' investments in sweep funds.

**B.     CIRI's Receipt of Revenue Sharing Created Significant Conflicts of Interest**

53.     As a result of CIRI's NTF and sweep revenue sharing arrangements with the Clearing Brokers, CIRA's interests were in conflict with its clients.  The revenue sharing arrangements created financial incentives for CIRA to invest clients in NTF mutual funds and sweep funds that would lead to greater revenue sharing for CIRI.  This was a material conflict of interest for CIRA, which was exacerbated by the fact that the NTF mutual funds and sweep funds that generated revenue for CIRI were typically more expensive than other available similar options, and thus not in the best interests of CIRA's advisory clients.

54.     Regarding NTF revenue sharing, CIRA had a material conflict of interest because it had a financial incentive to select and hold more expensive mutual funds for clients, including

NTF mutual funds, when lower-cost share classes of the same mutual fund were available to clients, but for which CIRI received less or no NTF revenue.

55.     CIRI's NTF revenue sharing agreements with Clearing Broker 1 was also limited to certain mutual funds, meaning that CIRA had an incentive to choose certain mutual funds that generate revenue sharing over others that did not.  For example, CIRA could purchase or sell Fidelity mutual funds for its clients through Clearing Broker 1's NTF program, but these investments did not result in NTF revenue sharing with CIRI, whereas CIRI received revenue for NTF mutual funds from other fund families.

56.     Regarding sweep revenue sharing, CIRA had a conflict of interest because it had an incentive to recommend that clients hold uninvested cash in sweep funds that generated revenue sharing over other non-revenue generating investments.

57.     Further, CIRA had a financial incentive to select and hold more expensive sweep funds for clients that generated revenue, even when lower-cost sweep funds, or lower-cost share classes of the same fund, that did not generate revenue sharing were available to clients.

58.     In the case of Clearing Broker 1, the sweep fund share classes that resulted in sweep revenue were more expensive and lower-yielding than other available share classes of the same funds that did not result in CIRI receiving sweep revenue.  With Clearing Broker 2, the revenue-generating sweep funds were more expensive and lower-yielding than similar, available funds that did not result in CIRI receiving sweep revenue.

59.     The millions of dollars of NTF and sweep revenue that CIRI received from the Clearing Brokers was sufficient to create meaningful incentives for CIRA to invest its clients' assets in investments that were more profitable to CIRI, and more expensive for clients.

**C.      CIRA Failed to Adequately Disclose the Revenue Sharing Conflicts of Interest to its Clients and Failed to Act in its Clients' Best Interest**

60.      CIRA failed to fully and fairly disclose the conflicts of interest associated with CIRI's revenue sharing arrangements with the Clearing Brokers.  CIRA knew or should have known that it was required by law to fully disclose conflicts of interest to its advisory clients, including how the firm intended to address such conflicts, because, among other reasons, the instructions to Form ADV provided such guidance.  Yet CIRA repeatedly failed to sufficiently disclose these conflicts of interest to its clients and was at least negligent in doing so.  CIRA also failed to act consistent with its duty of care obligations to its clients regarding the revenue-generating investments.

*1.      NTF Revenue Sharing*

61.      From at least January 2014 to at least August 2019, CIRA failed to adequately tell clients that it had incentives to invest clients in more expensive NTF mutual funds in order for CIRI to receive revenue, when lower-cost share classes were available for the same fund.  In particular, CIRA failed to disclose to clients that in many cases there were mutual funds in the NTF programs that had a lower-cost share class available to clients that did not result in revenue sharing payments to CIRA, and thus CIRA was investing clients in mutual funds that were contrary to the clients' best interests.  CIRA also (1) failed to tell clients that CIRI's NTF revenue sharing agreement with a clearing broker was limited to certain mutual funds and thus CIRA had an incentive to select those funds over others; and (2) misled clients that it would address the conflicts associated with investing clients in mutual funds.

62.     From at least January 2014 through August 2019, CIRA generally disclosed that CIRA and CIRI had entered into revenue sharing arrangements and that such arrangements presented a conflict of interest.

63.     CIRA also disclosed that: (1) CIRI received "revenue sharing participation" for assets that were held in the NTF programs offered by Clearing Broker 1 and Clearing Broker 2; (2) the NTF mutual funds could be purchased "at no cost to CIRA, the CIRA Advisor Representative or the client"; and (3) "some mutual funds in this NTF program have higher internal expenses than mutual funds that are not in the NTF program."

64.     Regarding Clearing Broker 3, during this same timeframe, CIRA generally disclosed that CIRI received a "fee" for "assets in certain mutual funds" held by Clearing Broker 3, and that "[b]ecause CIRA receives an economic benefit, it has a potential conflict of interest in recommending to clients that they use [Clearing Broker 3] as custodian and invest their assets in certain mutual funds."  It was not until March 2019, when CIRA revised its Brochure to specifically disclose that CIRI "receives revenue for assets in [Clearing Broker 3's NTF mutual fund program], which is a conflict of interest because of the increased compensation to [CIRI]."

65.     The above disclosures regarding CIRA's conflicts of interest between at least January 2014 and at least August 2019 were materially inadequate, false, and/or misleading:

66.     *First*, CIRA failed to adequately disclose to clients that the clients would pay the higher expense of being in a revenue-generating NTF mutual fund when a lower-cost share class of the same fund was available, and the related conflicts of interest discussed above.

67.     *Second*, CIRA failed to tell clients that CIRI's NTF revenue sharing agreement with a clearing broker was limited to certain mutual funds, such that CIRA had an incentive to

invest clients in mutual funds that generated revenue sharing over other non-revenue generating investments.

68.    **Third**, from at least January 2014 to the present, when generally referencing CIRI's revenue sharing arrangements, CIRA has repeatedly disclosed that it "endeavor[s] at all times to put the interest of [its] clients ahead of [its] own… these arrangements could affect the judgment of [CIRI] or its affiliated persons when recommending investment products." This disclosure falsely and misleadingly indicates that CIRA would address the conflicts associated with investing clients in NTF mutual funds by prioritizing clients' best interests over its own.

69.    However, in violation of CIRA's duty of care, CIRA invested clients in more expensive NTF mutual funds that generated revenue sharing even when lower-cost share classes of the same fund were available that, given the circumstances, would have been in the clients' best interests. By doing so CIRA also breached its fiduciary duty to seek best execution for its clients. Moreover, CIRA's continued failure to assess whether clients invested in NTF mutual funds should be converted to lower-cost share classes is contrary to its duty of care and statements that despite its conflicts of interest, CIRA would "endeavor at all times to put the interest of [its] clients ahead of [its] own."

2.    *Sweep Revenue Sharing*

70.    From at least January 2014 to the present, CIRA failed to adequately tell clients that it had incentives to invest clients in certain sweep funds in order for CIRI to receive sweep revenue, including more expensive funds when lower-cost funds or share classes of the same fund were available to clients.

71.    From January 2014 to November 2018, CIRA failed to tell clients that CIRI received any sweep revenue sharing or otherwise disclose facts relating to its conflicts of interest

relating to the sweep revenue sharing.  While CIRA did provide clients with a separate disclosure

drafted by Clearing Broker 2, the disclosure only generally described the revenue sharing

program and stated that "[p]articipation by [CIRI] in this program is *optional* and that [CIRI]

*may* share with [Clearing Broker 2] in such fees." (Emphasis added).  This disclosure failed to

inform CIRA's clients that CIRI actually *did* participate in the program and *did* receive fees.  It

further failed to address the availability of similar lower-cost funds and the associated conflicts

of interest with such sweep revenue sharing.

72.     Thus, CIRA failed to disclose that the sweep revenue CIRI received created an

incentive for CIRA, when rendering investment advice to its clients, to recommend that clients

hold uninvested cash in sweep funds that generated revenue sharing over other non-revenue

generating investments.  CIRA also did not disclose that these revenue-generating sweep funds

were more expensive and often lower-yielding than other similar sweep funds or share classes of

the same fund that were available to the clients, or that CIRA would select the more expensive

option for clients.

73.     In November 2018, CIRA disclosed in its Brochure for the first time that CIRI

generally received revenue from "sweep options" and that this "creates a conflict of interest due

to the financial benefits for [CIRI]."  Beginning in March 2019, CIRA for the first time

specifically disclosed to clients in its Brochure that CIRI received a "financial benefit" when

clients are placed into a "money market sweep" (*i.e.* sweep fund), and that this represents a

conflict of interest.

74.     However, these disclosures were inadequate because they do not disclose that the

sweep revenue sharing created an incentive for CIRA to recommend that its clients keep money

in sweep funds and to purchase or hold a sweep fund that generated revenue over other non-revenue generating and lower-cost options.

75.     Further, as referenced above, CIRA repeatedly discloses that it "endeavor[s] at all times to put the interest of [its] clients ahead of [its] own… these arrangements could affect the judgment of [CIRI] or its affiliated persons when recommending investment products."  This misleadingly indicates that CIRA would address the conflict associated with investing clients in sweep funds by prioritizing clients' best interests over its own.  However, in violation of CIRA's duty of care, CIRA invested clients in more expensive sweep funds that generated, or have the potential to generate, revenue sharing even when lower-cost funds or share classes of the same fund were available that, given the circumstances, would have been in the clients' best interests. CIRA also breached its fiduciary duty to seek best execution for its clients.

## V.     CIRA Violated its Fiduciary Duty to Its Clients When Selecting Investments which Allowed CIRA to Avoid Paying Transaction Fees

76.     From at least January 2014 to at least December 2016, CIRA had a financial incentive to select NTF mutual funds for clients in wrap accounts rather than lower-cost share classes of the same fund which would require CIRA to pay transaction fees.  From at least January 2014 to the present, CIRA has invested and held wrap account clients in more expensive NTF mutual funds even when lower-cost options were available, even after CIRI moved to an asset-based fee model for brokerage services in December 2016 that eliminated transaction fees.

77.     From at least January 2014 to at least December 2016, CIRA violated its fiduciary duty to clients by failing to disclose its conflicts of interest in recommending that wrap account clients purchase NTF mutual funds for which CIRA would avoid paying transaction fees.  From at least January 2014 to the present, CIRA also violated its fiduciary duty to clients by (1)

investing wrap account clients in NTF mutual funds that were not in the clients' best interest;
(2) failing to seek best execution; and (3) failing to evaluate whether clients should be moved to
a lower-cost mutual fund option.

78.     CIRA benefitted when a wrap account client's trades incurred no or lower
transaction costs because CIRA would retain a larger share of the client's fee when it incurred
lower out-of-pocket expenses.  In contrast, CIRA would incur more expenses (and thus retain
less of a wrap account client's annual advisory fee) if the client's trades incurred higher
transaction costs that CIRA was responsible for paying.

79.     For CIRA's wrap accounts, since the client does not pay a separate transaction
fee, it is in the client's best interest to be in the mutual fund share class with a lower expense
ratio.

80.     From at least January 2014 to at least December 2016, CIRA had a conflict of
interest associated with its selection of NTF mutual funds for wrap accounts because it was
responsible for paying client transaction fees.  CIRA acted in its own interest and contrary to
clients' interests by investing clients in wrap accounts in NTF mutual funds, whereby CIRA
avoided paying transaction fees while subjecting its clients to higher advisory fees.

81.     In violation of its fiduciary duty, CIRA did not disclose that it had an incentive to
select investments for which CIRA would not pay any transaction costs, including more
expensive mutual funds that were not in its clients' best interest.

82.     CIRA's failures to disclose this information were omissions of material fact
which were required to be disclosed to CIRA's advisory clients, and CIRA acted at least
negligently in failing to disclose such information.

83.     From at least January 2014 to at least December 2016, CIRA allocated hundreds of thousands of mutual fund transactions in wrap accounts to NTF mutual fund share classes.  As a result, CIRA avoided paying millions of dollars in transaction fees.

84.     Further, from at least January 2014 to the present, when CIRA invested its wrap account advisory clients' assets in higher-cost NTF mutual funds despite the availability of a lower-cost option, CIRA acted at least negligently in breaching its duty of care to act in the best interest of its clients.  When CIRA invested wrap account clients in higher-cost NTF mutual funds when lower-cost share classes of the same mutual fund were available, CIRA also acted at least negligently in failing to seek best execution for its clients.

85.     Beginning in or about December 2016, CIRI moved to an asset-based fee arrangement with at least Clearing Broker 1 and Clearing Broker 2.  However, CIRA has kept at least some wrap clients invested in more expensive share classes that it had bought as part of the NTF mutual fund program, when lower-cost share classes of the same mutual fund have remained available and are more beneficial to clients.  By doing so CIRA has continued to at least negligently fail to act in its clients' best interest in violation of its duty of care.

**VI.    CIRA Violated Its Fiduciary Duty When Converting Clients to Wrap Accounts**

86.     Beginning in July 2017, CIRA repeatedly violated its fiduciary duty to clients by converting certain traditional accounts to wrap accounts without providing clients with full and fair disclosure concerning the conversions and instead providing false and misleading information regarding the necessity for the conversions.  CIRA also failed to disclose that it had a financial incentive to convert clients from traditional accounts to wrap accounts given that CIRA collected higher advisory fees from wrap accounts.  Further, CIRA violated its fiduciary duty by failing to adequately determine, and failing to provide adequate training, educational

information, or guidance to its IARs regarding how to determine whether the conversion was in each client's best interest.

87.     In April 2016, the United States Department of Labor issued a final regulation (effective in June 2017) that imposed a fiduciary duty on investment advisers who advised clients with regards to pension and retirement funds (the "Fiduciary Rule").

88.     Beginning in July 2017, CIRA sent notification letters to two categories of clients advising them of changes in the fee structure of their accounts.  Those two categories of clients included (1) those who held qualified (*i.e.*, retirement) discretionary accounts and (2) those who held both qualified and non-qualified (*i.e.*, non-retirement) discretionary accounts.

89.     The letters informed these clients that, in response to the Fiduciary Rule, "CIRA has created [a new wrap program] for advisor-direct discretionary level fee accounts that provides greater fee transparency and a tiered program fee schedule."  The letters set forth a fee schedule that would be "effective" on a date certain, and noted that "[t]his change in fees may increase or decrease the total account fee deducted from your account."  The letters closed by stating: "If you have questions regarding the change in fees to your account, please contact your financial advisor prior to [the effective date referenced in the letters]."

90.     On or about the effective date specified in the letters, CIRA converted many of the recipients' advisory accounts – including, as applicable, non-retirement accounts – to wrap accounts and began charging clients an additional wrap fee pursuant to the newly-disclosed fee schedule.  CIRA converted thousands of clients with traditional non-retirement accounts to wrap accounts.

91.     At the time of these letters, CIRA knew, or should have known, that non-retirement accounts would not be affected by the Fiduciary Rule.  Nevertheless, CIRA also

elected to convert to wrap accounts the non-retirement accounts of clients who also held retirement accounts.

92.     Client accounts that were invested in higher-cost NTF mutual funds before the wrap account conversion remained in those mutual funds despite CIRA assuming responsibility for paying transaction fees as part of the wrap accounts.  This occurred even when lower-cost mutual fund share classes of the same funds were available.

93.     CIRA violated its fiduciary duty to clients in numerous ways by converting retirement and non-retirement accounts to wrap accounts pursuant to these notification letters:

94.     *First*, CIRA did not provide full and fair disclosure regarding clients' options as to conversion (as discussed below).  Accordingly, CIRA's clients were not provided sufficient and accurate information necessary to provide informed consent to allow for an amendment of their advisory agreements and a change of their fee structure.  CIRA also failed to disclose to clients that they could elect not to convert any or all of their accounts to wrap accounts.

95.     *Second*, although the letters stated that clients' "fees may increase or decrease," CIRA did not provide any information for determining whether, and how, the proposed change would impact the fees each client paid.

96.     *Third*, the letters claimed that the changes were "necessary" to comply with the Fiduciary Rule requirement that all fees and commissions be clearly disclosed to clients. However, this statement was materially false and misleading as it applied to non-retirement accounts given that the Fiduciary Rule did not affect those accounts.

97.     *Fourth*, CIRA failed to disclose that it had a financial incentive to convert clients from traditional accounts to wrap accounts given that CIRA collected higher advisory fees from wrap accounts.

98.     *Fifth*, there was no basis for CIRA to conclude that it was in each client's interests to convert non-retirement accounts to wrap accounts simply because the account owner happened to also own a retirement account advised by CIRA.  In addition to converting all retirement accounts and non-retirement accounts owned by clients who held retirement accounts, CIRA allowed its IARs at this time to convert any other non-retirement accounts to wrap accounts.  CIRA, however, did not provide adequate training, educational information, or guidance to its IARs regarding how to determine whether the conversion was in each client's best interest.  Further, neither CIRA nor its IARs performed meaningful client-by-client analysis to determine that conversion was in the best interest of each affected client.

99.     As a result of CIRA's conversion of the above-referenced accounts to wrap accounts, clients paid more in advisory fees than they would have had they not been converted to wrap accounts, and in many cases CIRA failed to act in clients' best interests in making the conversion.

100.     These disclosure failures were materially false, misleading, and/or were omissions of material fact which were required to be disclosed to CIRA's advisory clients, and CIRA acted at least negligently regarding the disclosures.  CIRA also was at least negligent in violating its duty of care to clients by failing to adequately determine whether the conversion was in each client's best interest.

## VII.   CIRA Failed to Disclose Its Conflicts of Interest Relating to CIRI's Forgivable Loan Program

101.     From at least January 2014 to March 2018, CIRA failed to disclose, or adequately disclose, to its clients CIRI's forgivable loan program ("Forgivable Loans") and the associated conflicts of interest.

25

102.    Since at least January 2014, CIRI has offered CIRA IARs five-year Forgivable Loans totaling millions of dollars.  IARs typically used the Forgivable Loans to assist with costs associated with transitioning from their prior firm to CIRA.  CIRI also offered to cancel, or forgive, the Forgivable Loans based on certain criteria, such as maintaining certain asset levels and tenure with CIRA.

103.    The Forgivable Loans presented a conflict of interest in that CIRA IARs who received Forgivable Loans had a financial incentive to maintain a relationship with CIRI and recommend CIRI to clients in order to ensure the loans were forgiven.  In particular, the CIRA IARs received compensation from CIRI in the form of forgiveness of the Forgivable Loans, while at the same time recommending CIRI as an introducing broker.

104.    In its February 2017 Brochure, CIRA first disclosed that CIRA IARs "*may*" receive Forgivable Loans from CIRI, and that "[t]he receipt of a loan from [CIRI] presents a conflict of interest in that the CIRA Advisor Representative *may* have a financial incentive to maintain a relationship with [CIRI] and recommend [CIRI] to clients." (Emphasis added).

105.    However, this disclosure was inadequate because CIRA IARs *did* receive such Forgivable Loans from CIRI, and because the CIRA IARs *did* have a financial incentive to maintain a relationship with CIRI and recommend CIRI to clients.

106.    CIRA's failures to disclose, or adequately disclose, the conflicts associated with the Forgivable Loans were omissions of material fact, CIRA was required by law to fully disclose its conflicts of interest to its advisory clients, and CIRA acted at least negligently in failing to disclose such information.

## VIII.   CIRA Failed to Adopt and Implement Required Written Policies and Procedures

107.    CIRA failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act in connection with its investment selection, selection of (and conversion of) account type for clients, making recommendations of investments that were in the best interests of its advisory clients, and disclosure of conflicts of interest.

108.    While CIRA had a general written policy for disclosing and remediating conflicts of interest, this policy did not address investment selection practices, and it was not implemented so that CIRA made adequate disclosures regarding conflicts created by CIRI's receipt of revenue sharing payments, CIRA's avoidance of transaction costs, CIRA's selection of the wrap program for clients, and the forgivable loan program.

109.    While CIRA also had a general written policy to seek best execution for its clients, including as to mutual funds, CIRA failed to implement that policy in the context of its investment selection practices, and in particular selecting mutual funds, sweep funds, and share classes that were in the best interests of its clients.  CIRA also failed to evaluate existing client holdings during the account review process to determine whether a more favorable mutual fund, sweep fund, or share class was available subsequent to the initial purchase.

110.    CIRA also lacked written policies and procedures concerning the evaluation and selection of account types for clients, such that clients would be placed and held in accounts that were most appropriate for their needs.

111.    Therefore, CIRA failed to adopt and implement written policies and procedures reasonably designed to prevent Advisers Act violations.

## COUNT I

### Violation of Section 206(2) of the Advisers Act
### (Against Defendant CIRA)

112.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

113.    CIRA is an investment adviser defined by Section 202(a)(11) of the Advisers Act

[15 U.S.C. § 80b-2(a)(11)].

114.    CIRA, at least negligently and in violation of the applicable standard of care,

engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon

its advisory clients.

115.    By engaging in the conduct described above, CIRA, while acting as an investment

adviser, directly or indirectly, by use of the mails or means and instrumentalities of interstate

commerce, engaged in transactions, practices, and courses of businesses which operated as a

fraud or deceit upon its advisory clients.

116.    By reason of the foregoing, CIRA violated, and unless enjoined there is a

reasonable likelihood that it will continue to violate, Section 206(2) of the Advisers Act [15

U.S.C. §§ 80b-6(2)].

## COUNT II

### Violation of Section 206(4) of the Advisers Act & Rule 206(4)-7 Thereunder
### (Against Defendant CIRA)

117.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

118.    Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] provides that it is

unlawful for an investment adviser to engage in an act, practice, or course of business which is

fraudulent, deceptive, or manipulative.  It further states that the SEC shall issue rules to define

and prescribe measures to prevent such misconduct.  Rule 206(4)-7 issued under the Advisers

Act [17 C.F.R. § 275.206(4)-7] requires, among other things, that investment advisers adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules.  Investment advisers must also review the adequacy of those policies and procedures and the effectiveness of their implementation, at least annually.

119.    CIRA failed to adopt and implement written policies and procedures reasonably designed to prevent its violations of the Advisers Act.

120.    By reason of the foregoing, CIRA has directly or indirectly violated, and unless enjoined will likely again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

## COUNT III

### (Against Relief Defendant CIRI)

121.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

122.    CIRI received NTF and sweep revenue sharing payments from the Clearing Brokers to which it does not have any legitimate claim, as a result of CIRA's violations of Section 206(2) and 206(4) of the Adviser Act and Rule 206(4)-7 thereunder.

123.    CIRI obtained these ill-gotten gains and/or unjust enrichment described above as part, and in furtherance, of the securities laws violations alleged in this Complaint, under circumstances in which it is not just, equitable, or conscionable for it to retain the funds.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the SEC respectfully requests that this Court:

### **I.**

### **(Injunctive Relief Against Future Securities Law Violations)**

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining CIRA and its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with it who receive actual notice by personal service or otherwise, from further violating Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-7 thereunder [15 U.S.C. §§ 80b-6(2), 80b-6(4), and 17 C.F.R. § 275.206(4)-7].

### **II.**

### **(Disgorgement)**

Order CIRA and CIRI to disgorge any and all ill-gotten gains and/or unjust enrichment, together with pre-judgment interest, received directly or indirectly from the activities set forth in this Complaint.

### **III.**

### **(Civil Penalties)**

Order CIRA to each pay an appropriate civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### **IV.**

### **(Retention of Equitable Jurisdiction)**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## V.

### (Other Relief)

Grant such other relief as this Court may deem just or appropriate.

### <u>JURY DEMAND</u>

The SEC demands a trial by jury on all claims so triable.

Dated: March 1, 2022

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

<u>/s/ Timothy J. Stockwell</u>
TIMOTHY J. STOCKWELL
Trial Attorney
DAVID F. BENSON
Senior Attorney
JEFFREY A. SHANK
Assistant Regional Director
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 596-6049
Facsimile: (312) 353-7398
Email: stockwellt@sec.gov

*Attorneys for Plaintiff United States Securities and Exchange Commission*